UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FILED
APR 19 2017
U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) | No. **4:17CR178 JAR** |
| JOHN MAC SELLS, ) | |
| Defendant. ) | |

## INFORMATION

### COUNTS 1 and 2
### Health Care Fraud Scheme
### Title 18, United States Code, Section 1347(a)(1) and Section 2

The United States Attorney charges that:

1. At all relevant times, Defendant John Mac Sells (Sells) was the chief executive officer (CEO), president, or manager of Legacy Health Systems, LLC, and a number of long-term care facilities in Missouri, Kentucky, and Tennessee.

2. At all relevant times, Legacy Health Systems, LLC, was a Missouri corporation that provided management services to long-term care facilities owned or managed by Sells. The management services included, but were not limited to, human resources, payroll, accounts payable, and billing.

3. At all relevant times, Benchmark Healthcare of Festus, Inc. (Benchmark), a Missouri corporation, was a long-term care facility located in Festus, Missouri. Sells was the manager and president of Benchmark.

1

4. The majority of the residents in the homes managed by Legacy Health System were Medicaid recipients. Between 2013 and 2015, over 80% of the residents at Benchmark were Medicaid recipients and Medicaid paid Benchmark over 6 million dollars to care for these recipients.

### Relevant Regulations Concerning Skilled Nursing Facilities

5. As required by Missouri law, Benchmark obtained a license from the Section for Long Term Care Regulation (SLCR) of the Missouri Department of Health and Senior Services to operate an 81-bed skilled nursing care facility. To obtain and retain its license, Benchmark agreed to provide care to its residents in accordance with standards established by the Missouri Department of Health and Senior Services.

6. As authorized by statute (Sections 198.003 to 988. 085, RSMO), the Missouri Department of Health and Senior Services established standards for long-term care facilities. There are three categories of standards.

> (1) Class I standards are standards the violation of which would present either an imminent danger to the health, safety or welfare of any resident or a substantial probability that death or serious physical harm would result; (2) Class II standards are standards which have a direct or immediate relationship to the health, safety or welfare of any resident, but which do not create imminent danger; (3) Class III standards are standards which have an indirect or a potential impact on the health, safety or welfare of any resident.

7. On an annual basis, or more often if needed, SLCR surveyors conduct on-site licensure inspections to determine if a facility is in compliance with the applicable standards. If a facility is not in compliance, generally the facility must submit a plan of correction, specifying the corrective actions and the dates the actions will be completed. A continued failure to comply may result in revocation of the facility's license.

8. Skilled nursing facilities are eligible to receive reimbursement for services provided to Medicaid recipients if the facilities are licensed by the state and meet the requirements for participation as Medicaid providers.

### Relevant Missouri Medicaid Provisions

9. MO HealthNet administers the Missouri Medicaid Program, which is jointly funded by the State of Missouri and the federal government. Missouri Medicaid reimburses health care providers for covered services rendered to low-income Medicaid recipients. Medicaid is a health care benefit program, as defined by Title 18, United States Code, Section 24.

10. A Medicaid provider must enter into a written agreement to receive reimbursement for medical services to Medicaid recipients and must agree to abide by Medicaid regulations in rendering and billing for those services. At all relevant times, Benchmark was a Missouri Medicaid provider and submitted reimbursement claims to Medicaid for services to Medicaid patients.

11. Medicaid providers must retain, for five years from the date of service, fiscal and medical records that reflect and fully document services billed to Medicaid, and must furnish or make the records available for inspection or audit by the Missouri Department of Social Services or its representative upon request. Failure to furnish, reveal, or retain adequate documentation for services billed to the Medicaid Program may result in recovery of the payments for those services not adequately documented and may result in sanctions to the provider's participation in the Medicaid Program. This policy continues to apply in the event of the provider's

discontinuance as an actively participating Medicaid provider through the change of ownership or any other circumstance.

## DESCRIPTION OF THE FRAUD SCHEME

12.     Beginning in or about 2013 and continuing to in or about 2016, defendant Sells falsely represented, or caused others to falsely represent, that funds provided by Medicaid were used to provide care for residents at Benchmark, when, in fact, Sells diverted a large portion of those funds to his personal use. Because of this diversion of funds by Sells, Benchmark failed to provide required services to its residents and thereby jeopardized the health, safety, and welfare of the residents.

### Substandard Care At Benchmark

Dietary Deficiencies

13.     Benchmark was required to comply with the following Missouri regulations concerning the dietary needs of its residents.

> Each resident shall be served nutritious food, properly prepared, . . . to provide an adequate diet in accordance with the physician's order . . . A qualified professional, such as a dietitian or registered nurse, shall regularly assess these needs and shall keep the physician informed of the nutritional status of the resident. . . . At least three (3) substantial meals or other equivalent shall be served daily at regular hours with supplementary feedings as necessary. At least two (2) meals shall be hot.

19 CSR 30-85.052 (1) and (2).

14.     A long-term care facility, such as Benchmark, must insure that the facility is never without food for residents. Specifically, the regulation provides: "Supplies of staple food for a minimum of a one (1)-week period and of perishable foods for a minimum of a three (3)-day period shall be maintained on the premises." 19 CSR 30-85.052 (20).

4

15. Benchmark frequently failed to comply with these requirements. On May 13, 2016, Benchmark was cited by SLCR surveyors for not having a qualified dietician from August 25, 2015 to May 13, 2016; not developing menus; and not meeting the dietary needs of the residents.

16. On July 13, 2016, some residents complained to the SLCR surveyors that they were hungry and were not getting enough food. The SLCR surveyors confirmed that there was no food on the premises to feed the residents. Due to non-payment, the last delivery of food to Benchmark was on June 15, 2016. On this date and on other occasions, facility staff had to use their personal funds to buy food for the residents. However, there was still an insufficient amount of food to provide the residents with adequate meals and the dietary supplements ordered by their doctors. On July 21, 2016, Benchmark was cited again by SLCR for not meeting the dietary needs of the residents.

17. When the SLCR surveyors were at Benchmark on one occasion, the residents were only provided a bowl of broth soup and a very small cookie. Another meal consisted of 1-2 ounces of lunch meat, a half of a baked potato, and a small corn muffin. Neither of these meals was substantial and did not meet the nutritional needs of the residents.

Pharmacy Issues

18. Benchmark was required to purchase, maintain, and dispense medications ordered by the residents' doctors. In May 2016, the medical supply company quit servicing Benchmark due to non-payment. In the next month, June 2016, the pharmacy ended its service to Benchmark due to non-payment. As of June 7, 2016, Benchmark owed the pharmacy $168,990.46.

19. Benchmark was subsequently cited by SLCR surveyors on July 21, 2016 and again on August 9, 2016 for failure to provide necessary medications to residents. The medications were cardiac medications, anti-seizure medications, anti-psychotic medications, anti-depressants, antibiotics and diuretics.

20. Benchmark also failed to pay the medical testing laboratory, which resulted in a disruption in needed laboratory services.

Septic and Sanitation Issues

21. 19 CSR 30-87.020 of the Missouri regulations establishes sanitation requirements for long-term care facilities. In essence,

- the facilities, including walking and driving surfaces, must be kept free of litter,
- all floors, ceilings, walls, and doors must be clean and in good repair,
- all sewage must be disposed of by a sewage disposal system constructed and operated according to law,
- garbage and refuse must be kept in durable, easily cleanable, insect-proof and rodent-proof containers,
- garbage and refuse must be disposed of often enough to prevent odor and insects and rodents, and
- effective measures must be used to minimize rodents, flies, cockroaches and other insects on the premises.

22. Benchmark repeatedly failed to comply with these standards. In or about July, 2016, there was a large infestation of flies in the facility. Residents complained that the flies bothered them and got on their food. Facility staff killed numerous flies daily, but were unable

6

to eliminate the flies from the facility. The pest control company refused to provide services because Benchmark owed the company money.

23. The pest problem was in part the result of an accumulation of trash on the property. Trash was allowed to accumulate in open dumpsters and on the ground nearby. The trash and waste management company stopped service due to non-payment.

24. The pest problem was exacerbated by Benchmark's failure to properly maintain its septic system. The septic system included a lagoon or pond into which sewage flowed from the facility. The lagoon had to receive regular maintenance, which included placing chemicals in and removing sludge from the lagoon. The septic company came out around December 2015, but did not remove the sludge from the lagoon because of non-payment. The company that provided the chemicals stopped sending the chemicals because of non-payment. Additionally, the pump that was part of the septic system did not work properly, but was not repaired or replaced.

25. Floors, walls, ceilings, ceiling vents, doors, and doorknobs at Benchmark were not clean or in good repair. In the summer of 2016, Benchmark staff were given $1000 to make the needed repairs, which was inadequate to make the many needed repairs.

Benchmark's Non-payment of Other Service Providers

26. In addition to the above deficiencies, from 2014 and continuing through most of 2016, Benchmark failed to timely pay employees and vendors for other services that were essential to the health, safety, and welfare of its residents. As an example, staff payroll checks sometimes bounced. On other occasions, Sells withdrew funds from the residents' trust fund accounts to pay the staff. This was improper because patient trust funds were not to be used to

7

pay facility staff, but rather were to be used by the residents or their representatives or guardians acting for the benefit of the residents.

27. There were also warnings of shut-off – and, on occasion, actual cut-offs of needed services. During the summer of 2016, a cut-off of the electricity was averted by a last minute payment. The phone service was terminated, but restored the same day after a payment was made.

28. For two days in July 2016, PointClickCare denied access to the Benchmark database. Benchmark had contracted with PointClickCare to provide a cloud-based electronic health record (EHR). Without access, Benchmark staff could not review or update information into the residents' medical records. PointClickCare stated that it would terminate all services by September 15, 2016 if Benchmark did not pay $163,055.02, which was due for services already rendered.

### Sell's Fraudulent Diversion of Medicaid Funds

Adult Entertainment Clubs

29. It was part of the scheme and artifice to defraud that in January 2015, Sells used the Benchmark's debit card to expend a total of $19,783.50 at adult entertainment clubs:

- 1/12/15 – IRC LP Sauget (Penthouse Club) - $7,250.00
- 1/12/15 – IRC LP Sauget (Penthouse Club) - $596.00
- 1/14/15 – IRC LP Sauget (Penthouse Club) - $2,075.00
- 1/14/15 – IRC LP Sauget (Penthouse Club) - $2,075.00
- 1/14/15 – IRC LP Sauget (Penthouse Club) - $750.00
- 1/14/15 – Platinum Brooklyn - $2,812.50

8

- 1/14/15 – Platinum Brooklyn - $600.00
- 1/14/15 – Platinum Brooklyn - $3,625.00

30. Between August 2014 and July 2015, Sells used Benchmark's debit card to expend a total of $184,889.25 at adult entertainment clubs.

Casinos

31. It was further part of the scheme and artifice to defraud that between December 2014 and July 2015, Sells spent $4,513.86 on gambling and alcohol at casinos.

Pet Care

32. It was further part of the scheme and artifice to defraud that between November 1, 2014 and December 8, 2014, Sells used Benchmark's debit card to expend a total of $1,971.18 for goods and services for his pet.

- 11/1/14 – Kennelwood - $41.40
- 11/19/14 – Kennelwood - $36.00
- 11/19/14 – Kennelwood - $915.00
- 11/19/14 – Kennelwood - $10.76
- 11/19/14 – Kennelwood - $34.00
- 11/20/14 – Kennelwood - $11.89
- 11/24/14 – Kennelwood - $11.89
- 11/25/14 – Petsmart - $92.20
- 12/1/14 – Petco - $67.97
- 12/2/14 – Forum Vet - $267.07
- 12/5/14 – Kennelwood - $227.00

- 12/8/14 – Kennelwood - $256.00

33. Between August 2014 and July 2015, Sells used Benchmark's debit card to expend a total of $14,614.54 for pet care.

Bail Bonds

34. It was further part of the scheme and artifice to defraud that in or about August 2016, Sells caused two checks to be written, one check drawn on the account of Heritage Gardens of Sikeston and another check drawn on the account of Benchmark. Each check was for $1750 and payable to the same person. The memo line of the second check stated: "Final Payment Bond JMS."

Country Club Payments

35. It was further part of the scheme and artifice to defraud that between January 31, 2014 and January 30, 2015, Sells made payments totaling $11,566.51 to his country club.

- 1/31/14 - $1,677.64
- 3/24/14 - $843.00
- 4/15/14 - $808.00
- 7/3/14 - $1,597.45
- 9/5/14 - $1,500.00
- 11/12/14 - $2,940.36
- 1/30/15 - $2,200.06

Transfers into Sells' Personal Accounts

36. It was further part of the scheme and artifice to defraud that Sells caused checks totaling $194,259.17 and wire transfers totaling $226,318.30 to be transferred into Sells'

10

personal accounts. These transfers, totaling $439,077.47, were separate and apart from Sells' expenditures described in the preceding paragraphs and from the substantial salary that he was paid by Benchmark.

Transfers into Accounts of Sells' Relatives

37. It was further part of the scheme and artifice to defraud that Sell caused $153,000 to be transferred on July 1, 2014 to B.S., a close relative of Sells. Multiple transfers were also made to M.S. from company accounts.

## Execution of the Health Care Fraud Scheme

38. From in on or about April 2014 to August 2016, Medicaid patients T.F. and D.B. were Benchmark residents who were diagnosed with very serious chronic diseases.

39. During the time they were at Benchmark, SLCR surveyors cited Benchmark for failing to provide proper nutrition, medications, and other needed services, as more fully set forth in the preceding paragraphs.

40. During this same period, Sells diverted Medicaid funds and used the funds to purchase goods and services for his personal use.

41. On or about the dates indicated below, in the Eastern District of Missouri,

**JOHN MAC SELLS,**

the defendant herein, knowingly and willfully executed, and attempted to execute, the above described scheme and artifice to defraud a health care benefit program, in connection with the delivery and payment for health care benefits, items, and services, that is, the defendant submitted, or caused the submission of, reimbursement claims to Medicaid, a health care benefit program, which claims falsely represented that the funds provided by Medicaid were expended

11

for the care of Medicaid patients, when Sells knew at the time that he had diverted funds for his personal use.

| Count | Date of Claim | Patient |
|---|---|---|
| 1 | August 27, 2014 | T.F. |
| 2 | September 9, 2016 | D.B. |

In violation of Title 18, United States Code, Section 1347(a)(1) and Section 2.

Respectfully submitted,

CARRIE COSTANTIN
Acting United States Attorney

DOROTHY L. McMURTRY, #37727MO
Assistant United States Attorney
111 South 10th Street, Room 20.333
St. Louis, Missouri  63102
(314) 539-2200

UNITED STATES OF AMERICA )
EASTERN DIVISION )
EASTERN DISTRICT OF MISSOURI )

I, Dorothy L. McMurtry, Assistant United States Attorney for the Eastern District of Missouri, being duly sworn, do say that the foregoing information is true as I verily believe.

_____
DOROTHY L. McMURTRY, #37727MO

Subscribed and sworn to before me this 7th day of April, 2017

_____
CLERK, U.S. DISTRICT COURT

By: _____
    DEPUTY CLERK